IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *ex rel.* ANN HOWARD, | ) | |
| | ) | |
| Relator, | ) | No. 03 C 7668 |
| | ) | |
| v. | ) | Wayne R. Andersen |
| | ) | District Judge |
| URBAN INVESTMENT TRUST, INC., | ) | |
| an Illinois corporation and its successor, | ) | |
| RM HOLDINGS; SYNERGY | ) | |
| AFFILIATES, LLC, an Illinois limited | ) | |
| liability company, and RUDY MULDER, | ) | |
| ROXANNE GARDNER, and | ) | |
| JOHNNY TERZAKIS, individuals, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case is before the Court on a motion by defendant Synergy Affiliates, LLC ("Synergy") for summary judgment [210]. For the following reasons, Synergy's motion is granted in part and denied in part. The motion is granted with respect to Count IV, and it is denied with respect to Count III.

**BACKGROUND**

Plaintiff Annie Howard ("Howard") began doing work for Urban Investment Trust, Inc. ("Urban") in June 2000 as Senior Residential Accountant. In her position at Urban, Howard had access to accounting information of the Chicago Housing Authority ("CHA"). Between 2000 and the summer of 2002, Urban was the property manager for residential and commercial properties owned and operated by the United States Department of Housing and Urban Development ("HUD") and the CHA. Urban had a contract with the CHA that prohibited Urban from using money in CHA-HUD accounts for any purposes other than those listed in the

contract. Under the terms of the contract, Urban was permitted to deduct funds from the CHA accounts for housing expenses and payroll, but was prohibited from using government money for personal uses.

Synergy, a professional employer organization ("PEO"), contracted with Urban to provide payroll, benefits and human resources services to Urban and its employees. As a result of this relationship, Howard was on Synergy's payroll. Synergy and Howard agree that Urban and Synergy were essentially co-employers of Howard and the other employees. (Def.'s Resp. to Pl.'s Stmt. of Additional Facts ¶ 31.) Madeline Hernandez ("Hernandez") was assigned to act as Synergy's field representative with Urban. A field representative's responsibilities include assisting the client company (in this case, Urban) with various human resource issues, such as benefits selection and management of benefits programs. Urban provided Hernandez with an office, where she processed documents and was also available to meet and talk with employees.

Howard alleges that, in early 2000, she observed that the CHA bank accounts did not reconcile with the CHA tenant ledgers and that the money missing from the CHA accounts had been deducted by Urban without proper supporting documentation. Howard alleges that Urban manager Peter Mori ("Mori") told Howard that Urban would return the money to the CHA accounts by the end of the year and that she should reconcile the accounts as if the money were there. Howard reconciled the bank accounts to indicate that the withdrawals had never occurred. Howard alleges that this was the only time that she reconciled the bank accounts and that in April 2002, after Howard subsequently refused to further reconcile the accounts, Mori hired another employee who assumed many of Howard's responsibilities.

Howard alleges that she contacted Hernandez on multiple occasions to inform her of the alleged fraud and embezzlement occurring at Urban, and also to inform her that Howard was

being harassed and pressured to participate in the supposed fraud. Howard claims that Hernandez responded by indicating that she would investigate the situation, but she then failed to take any action. The parties dispute whether these discussions actually took place, and if so, what the true substance of these discussions may have been.

Howard asserts that in February 2002, she met with criminal investigators from the CHA's Office of the Inspector General, answering their questions and telling them she believed Urban was engaged in fraud and embezzlement of CHA funds. Howard also asserts that she informed Hernandez of her meeting with CHA investigators sometime in February or March 2002.

On June 2, 2002, Howard decided to leave her employment at Urban because she felt she was being harassed, which she claims amounted to constructive discharge from her employment.

Plaintiff's Fourth Amended Complaint named as defendants Urban, RM Holdings, Rudy Mulder, Roxanne Gardner, Johnny Terzakis and Synergy, and it set forth four separate counts. Synergy is named in Counts III and IV. Count III is a claim of retaliation and constructive discharge, pursuant to 31 U.S.C. § 3730(h) of the False Claims Act. Count IV is a claim for intentional infliction of emotional distress.

Synergy filed the instant motion for summary judgment with respect to Counts III and IV on August 20, 2009, arguing that the undisputed facts show that Plaintiff is unable to prove the requisite elements of the claims against Synergy. Howard opposes the motion, insisting that genuine issues of material fact remain, and that both claims against Synergy should reach a jury.

**LEGAL STANDARD**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

3

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 277, 248 (1986). Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). The existence of a factual dispute is not sufficient to defeat a summary judgment motion; instead, the nonmoving party must present definite, competent evidence to rebut the motion for summary judgment. *See Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). In reaching its holding, the court will consider the evidence in a light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *See Anderson*, 477 U.S. at 255.

**DISCUSSION**

We first address Count III, the retaliation claim, and then address Count IV, which alleges intentional infliction of emotional distress.

**I.     Count III – Retaliation**

The False Claims Act ("FCA") imposes a civil penalty and treble damages upon any person who presents to the United States government "a false or fraudulent claim for payment or approval." 31 U.S.C. 3729(a). "To enhance enforcement, the Act permits private persons known as relators to bring *qui tam* actions on behalf of the government." *Fanslow v. Chicago Mfg. Center, Inc.*, 384 F.3d 469, 479 (7th Cir. 2004). The FCA contains a provision designed to protect whistleblowers from retaliation by their employers.

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor or agent whole, if that employee, contractor, or agent is

> discharged, demoted, suspended, threatened, harassed, or in any other manner
> discriminated against in the terms and conditions of employment because of
> lawful acts done by the employee, contractor, or agent on behalf of the employee,
> contractor, or agent or associated others in furtherance of other efforts to stop 1 or
> more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

In order to establish a claim of retaliation under § 3730(h), Howard must prove the following elements: "(a) [her] actions were taken 'in furtherance of' an FCA enforcement action and were therefore protected by the statute; (b) [her] employer had knowledge that [she] was engaged in this protected conduct; and (c) [the adverse employment action] was motivated, at least in part, by the protected conduct." *Fanslow*, 384 F.3d at 479 (citing *Brandon v. Anesthesia & Pain Mgmt. Assoc., Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002)). We address each of these elements in turn.

With respect to the first element, that Plaintiff engaged in protected activity, Synergy stated that it "will not argue the first prong of the test," but it is "unaware of any protected conduct under the FCA on Plaintiff's part and she must provide evidence of protected conduct on her part for this Court to sustain her purported claim." (Mem. in Supp. of Mot. for Sum. J. at 13 n. 7.) The concept of "protected activity" is to be interpreted broadly, in light of the purpose of the FCA. *Fanslow*, 384 F.3d at 479. "[T]he relevant inquiry to determine whether an employee's actions are protected under § 3730(h) is whether '(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.'" *Id.* at 480 (quoting *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002)). We conclude that Plaintiff has put forth sufficient evidence to support the first element of her retaliation claim to at least reach a jury on this issue.

With respect to the second element, Howard must demonstrate that her "protected conduct put [her employer] on notice of the distinct possibility of a *qui tam* action." *Fanslow*, 384 F.3d at 483 (citing *Brandon*, 277 F.3d at 945). As the parties note in their briefs, precisely what notice is required depends, in part, on the individual employee's responsibilities, because the Seventh Circuit has recognized a "heightened notice requirement for employees who are charged with investigating fraud," labeling such individuals as "fraud-alert" employees. *Fanslow*, 384 F.3d at 484. For our present purposes, however, it is irrelevant whether Howard qualifies as a "fraud-alert" employee. Howard alleges not simply that Synergy *should have* known of her intentions to report the suspected fraud to the government, but that Synergy *actually knew* of that such reporting had occurred. Howard claims that she met with Hernandez in February or March of 2002 and specifically told Hernandez that she had actually met with CHA investigators. (Pl.'s Stmt. of Facts ¶ 14.) Synergy denies that this meeting (and others) ever took place, but at the summary judgment phase we must draw all reasonable inferences in Howard's favor. Therefore, regardless of what notice standard applies to Howard, a reasonable jury could find that this notice element has been satisfied.

The third and final element requires Howard to demonstrate that (a) an adverse employment action was taken against her, and (b) it was motivated, at least in part, by the protected conduct. *Fanslow*, 384 F.3d at 485 (citing *Brandon*, 277 F.3d at 944). Howard does not claim that Synergy played an active role in the alleged harassment that led to her "constructive discharge," but rather points to Synergy's failure to investigate or stop the harassment, despite the fact that Synergy had an obligation to investigate employee complaints. Synergy argues that, in order for liability to attach, the employer must engage in some sort of affirmative retaliatory action, and Howard's claims of "intentional inaction" on Synergy's part

6

are insufficient. However, the statute is not limited solely to affirmative action, but also covers situations in which an employee is "*in any other manner discriminated against* in the terms and conditions of employment." 31 U.S.C. § 3730(h)(1) (emphasis added). Synergy admits that it was responsible for the human resource functions at Urban, that Howard was supposed to report any problems she had to Synergy, and that Synergy had assumed responsibility for investigating complaints of illegal conduct made by employees at Urban. (Pl.'s Stmt. of Facts ¶¶ 33-34.) A failure to execute those duties with respect to a specific employee could be discrimination in the terms and conditions of employment for that individual employee.

Turning to the issue of motivation, the question is whether Synergy's failure to investigate or intervene was at least partially motivated by the fact that Howard had engaged in conduct protected by the FCA. Synergy claims that it had no motivation to retaliate against Howard for her whistle-blowing activity because Synergy was not the target of any embezzlement investigation. However, even though Synergy was not the target of the investigation, Synergy arguably had an incentive to ensure that its client, Urban, avoid such investigations, as Synergy's financial health is partially tied to Urban's ability to compensate Synergy for its services.

Since a reasonable jury could conclude that Howard established all three elements of her retaliation claim pursuant to § 3730(h), and material factual disputes surrounding these issues remain, summary judgment cannot be granted for the retaliation claim.

## II.     Count IV – Intentional Infliction of Emotional Distress

In Count IV, Plaintiff "seeks damages against all defendants for the Intentional Infliction of Emotional Distress." (Fourth Am. Compl. ¶ 3.) Under Illinois law, a claim for intentional infliction of emotional distress requires three elements: "(1) the conduct involved must be truly
7

extreme and outrageous; (2) the defendant must either intend the infliction of emotional distress or know that there is a high probability that his conduct will result in such distress; and (3) the conduct must in fact cause severe emotional distress." *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 660 (7th Cir. 2001) (citing *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988)).

"To qualify as outrageous, the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 983 (7th Cir. 2008) (internal quotations omitted). Synergy's conduct in this case does not meet this demanding standard.

While the parties agree that Synergy and Urban served as Howard's "co-employers," that does not mean that they shared all employer responsibilities equally. Synergy was responsible for various human resource functions, but was not directly involved with the day-to-day operations and supervision of Urban employees. Howard alleges that she was encouraged and even coerced to engage in illegal conduct, and that she was harassed as a direct result of her refusal to participate in those illegal activities. The employees who allegedly pressured Howard to break the law, though presumably co-employed by Synergy as well, were acting in their roles as representatives of *Urban* when directing Howard in the handling of Urban's finances. Howard does not assert that any representatives of *Synergy* directly engaged in such coercive or harassing behavior. The relevant conduct attributable to Synergy in this situation is Synergy's failure to investigate Howard's alleged complaints regarding the harassment she was facing at the hands of her Urban supervisors and colleagues. Failure to investigate complaints, while disappointing and even conceivably retaliatory in nature (as discussed above), hardly amounts to conduct that goes "beyond all possible bounds of decency." *Breneisen*, 512 F.3d at 983.

Howard cites several Illinois cases which assert that an employer's attempt to coerce an employee into engaging in some type of wrongful activity may constitute extreme and outrageous conduct. *Milton v. Illinois Bell Telephone Co.*, 427 N.E.2d 829 (Ill. App. Ct. 1981); *Johnson v. Federal Reserve Bank*, 557 N.E.2d 328 (Ill. App. Ct. 1990); *Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858 (Ill. App. Ct. 2000); *McGrath v. Fahey*, 533 N.E.2d 806 (Ill. App. Ct. 1988). However, Synergy points out the distinction that in each of those cases, "the defendant employer was the very same party who attempted to coerce the plaintiff." (Def.'s Reply Mem. in Supp. of Mot. for Summ. J. at 20.) We believe this is an important distinction. Without more direct involvement in the alleged coercion and harassment, Synergy's mere failure to investigate Howard's complaint does not rise to the level of extreme and outrageous.

Since Howard cannot establish the first element of her claim for intentional infliction of emotional distress, we need not address the other elements of this claim. Count IV cannot survive Synergy's motion for summary judgment.

**CONCLUSION**

For the foregoing reasons, Synergy's motion for summary judgment [210] is granted in part and denied in part. The motion is denied with respect to Count III, retaliation under § 3730(h). The motion is granted with respect to Count IV, intentional infliction of emotional distress, and judgment is entered for Synergy with respect to Count IV. Count IV remains with respect to the Urban defendants identified in Plaintiff's Fourth Amended Complaint (Urban and individuals Rudy Mulder, Roxanne Gardner and Johnny Terzakis).

It is so ordered.

                                                  Wayne R. Andersen
                                                  United States District Judge

Dated: March 8, 2010