**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, *ex rel*. **ANN HOWARD**, | |
| **Plaintiff**, | **Case No. 03 C 7668** |
| **v.** | **Hon. Harry D. Leinenweber** |
| **URBAN INVESTMENT TRUST, INC., RM HOLDINGS, RUDY MULDER, ROXANNE GARDNER, and JOHN TERZAKIS**, *et al.*, | |
| **Defendants.** | |

## MEMORANDUM OPINION AND ORDER

Relator and Plaintiff Ann Howard ("Relator" or "Howard") sues her former employer Urban Investment Trust, Inc. ("UIT"), along with *inter alia* its principals Rudy Mulder ("Mulder"), Roxanne Gardner ("Gardner"), and Johnny Terzakis ("Terzakis").  On behalf of the United States, she alleges that Defendants embezzled government funds in violation of the False Claims Act (the "FCA"), 31 U.S.C. § 3729 *et seq.*  On her own behalf, she claims retaliation in violation of the FCA, as well as intentional direction of emotional distress.  Howard initially also sued Synergy Affiliates, LLC. ("Synergy"), which had been her co-employer (as the company UIT hired to manage its payroll and human resources functions.) Those claims, however, have been resolved.

At the relevant time, UIT managed a portfolio of commercial and residential real estate, owned by it or its myriad affiliates and subsidiaries. Its subsidiary Urban Residential Services Company, Inc. ("URSC") entered into an agreement with the Chicago Housing Authority ("CHA"), whereby URSC would manage six housing properties for elderly and/or low income individuals (the "CHA Properties"), in exchange for management and administrative fees. The fees evidently came from the Department of Housing and Urban Development ("HUD") by way of the CHA. UIT/URSC had to maintain separate operating and security deposit accounts for each of these properties, using their funds only for select purposes. URSC had the separate accounts, but may not have respected the rules.

UIT hired Howard as a non-CPA accountant in June 2000, in part to manage the CHA accounts. One must be specially certified to be an accountant for CHA properties; Howard became certified as UIT's CHA accountant in January 2001. In that role, she evaluated the accounts payable and receivable for each property, prepared monthly reports for each, and converted UIT reports into journal entries in CHA's system. Her reports were initially reviewed by Jay Johnson ("Johnson"), head of UIT's residential property operations. (After Johnson left, as discussed below, one Ben Reyes ("Reyes") reviewed the reports.)

UIT affiliates held two additional properties of note, which the parties refer to as the Lakeshore Dunes and South Shore

properties.  These were not CHA properties; they appear to have been privately owned by UIT-related entities, but "funded" by FHA-insured mortgages and HUD subsidies.  It appears to be undisputed that UIT was required to keep funds in the Lakeshore Dunes and South Shore accounts separate, as with the CHA properties.  Howard claims that she was the accountant for Lakeshore Dunes; she only had access to South Shore financial information via her coworker, Kathy Flores ("Flores").

Defendant Roxanne Gardner ("Gardner") started out as UIT's Chief Operating Officer, eventually becoming its CEO; she held a 5% and then 10% interest in UIT, and a similar interest in many of its affiliated companies.  Howard contends that Gardner ran UIT's daily operations.

Jack Hart ("Hart") was the Director of Residential Properties. This seems to have made him subordinate to Johnson, and meant that he dealt with many of the properties for which Howard was the accountant.

During her CHA accountant training in late 2000, Howard and her UIT trainer detected that someone had improperly transferred $655,030.55 out of CHA-related accounts.  Howard claims that they were directed to balance the books as if the money were still there.  At some point, Gardner became aware that this transfer had occurred.  (Gardner denies Howard's statement of fact to this effect, but testified at deposition that by the following July, she

was aware of the transfer, but believed it was a mistake. (Gardner Dep. 249:11-17.) Gardner is one of only a few people who could have made the transfers; no one admits making them.

By affidavit, UIT's Peter Mori ("Mori") stated that he and/or Ginny Heisserer ("Heisserer") monitored UIT and its affiliates' accounts daily, helping to arrange fund transfers between accounts as needed, all under the direction of Gardner and/or Terzakis. Before December 2000, he claims, this procedure did not include the accounts at issue here. However, on December 1, 2000, he claims, a check was issued for which funds were not available. He claims that Gardner stopped payment on the check and directed him to avoid the payee's calls. On December 8, 2000, he claims, $530,700 was removed from the CHA accounts as part of a consolidation of cash into UIT's main account; that day, the amount of the canceled check was wired out of the main account. Mori claims that the transfer included the CHA funds, but cannot recall who signed the transfer order. He claims that he learned none of this until December 11, but fails to note whether he verified the information. (Gardner justifiably challenges his statements as lacking foundation.)

Thereafter, he claims, the residential and CHA accounts were daily "monitored, funded and swept just like any other Urban corporate and portfolio account[.]" Mori Aff. ¶ 94. Mori claims that when he asked about the transfers, Terzakis responded: "What

else can I do?"  Heisserer gave a somewhat different account, and
noted that the transfers were recorded as loans.

Mori further avers that Gardner kept deposit slips for
Mulder's personal account and sometimes had the responsibility of
depositing money into it, covering his overdrafts with funds from
UIT's account.  *Id.* at ¶97.  Howard maintains that Gardner either
made or supervised improper transfers from the protected accounts
into UIT's general account, and from there into the principals'
personal accounts or the overdrawn accounts of their other business
holdings.  In doing so, Howard argues, Gardner profited from the
misappropriations, rendering UIT's corporate identity a fiction.

It appears undisputed that in January 2001, and repeatedly
thereafter, Howard reported to a Synergy representative that UIT
was "embezzling" money.  (It is disputed, however, whether she ever
used that term.)  Howard testified that she "may have" told Jay
Johnson about the transfers at the same time; she recalled telling
him in January or February that she was concerned about the
transfers and felt "harassed" by the situation and the pressure to
falsify accounting data.  At some point, Howard also shared her
concerns with Jack Hart, and allegedly told several employees,
including Hart and Mori, that she would not lie or go to jail for
UIT.

According to Howard, the improper transfers began again in the
spring of 2001 (out of the CHA, Lakeshore Dunes, and South Shore

accounts).  Gardner claims that she was not aware of these withdrawals until she returned from vacation in July 2001, at which point Mulder and Terzakis assured her that the money would be returned.  Johnson claims that after he wrote several memos about the withdrawals and insisted that the money be returned, Gardner fired him.  (She claims that their discussion is confidential, but denies that he was fired over unreturned funds.)  Howard testified that Johnson's firing scared her.

Hart claims that shortly before Johnson was fired, Gardner instructed him to collect rent due on the Urban-managed residential properties, "because Urban needs the money[,]" even after he explained that the money was not Urban's.  Hart Dec. at ¶ 42, 43. Gardner denies this conversation, arguing that Hart's testimony was "compromised" by Howard's counsel allegedly providing him free lunches and legal services in exchange for his testimony.  (Those are serious claims, but as immediately relevant here, implicate credibility issues inappropriate for summary judgment.)

In September 2001, Gardner and Howard spoke in person.  The content of their conversation is disputed, but it appears at least that Howard told Gardner that the CHA now required bank statements with the mandatory monthly reports (which would expose missing money).  Gardner evidently told Howard to turn over the statements, and prepare a report showing how much money was missing.

In October, Howard allegedly received a somewhat cryptic e-mail from Mori.  *See* Pl.'s Ex. P.  Howard forwarded the email to her supervisor Linda Tobin ("Tobin"), Jeff Tosello ("Tosello"), and "ideaperday@aol.com." In doing so, she objected to several parts of the e-mail, and stated, in part:  "I feel like my job is being threaten[ed] because of my knowledge of Urban's activities of the CHA accounts and that I am being harassed." *Id.*  Whether from Howard or Tosello, Gardner became aware of that e-mail, and spoke with Mori to ascertain his intent.

That month, Hart claims, Reyes tried to "fix" things with the CHA by whiting out parts of UIT's bank statements.  Reyes allegedly then signed the altered reports.  Gardner again challenges his testimony as tainted.

There appears to be no dispute that Howard did not take her information directly to the CHA.  Instead, she complained within UIT, and kept a spreadsheet of funds that she believed were improperly transferred.

Hart claims that he sent a memo to Reyes and Gardner on November 28, 2011, explaining that Urban was behind in bills relating to the CHA, Lakeshore Dunes, and South Shore properties. The next day, he contends, Reyes told him to either resign or be fired along with all of his friends.  Hart was fired.  In late 2001, he met with Alderwoman Helen Shiller, and they called the CHA Office of Inspector General (the "CHA OIG"), which began an

investigation.  At some point, Johnson became involved; their reports were based in part on Howard's information.

Around the same time, the UIT principals agreed to split up the partnership.  Roxanne Gardner submitted a resignation letter on November 1; it is disputed to what extent she still retained authority over UIT.  (Gardner formed a new company, Property Solutions Group ("PSG") that month.)  She claims that she resigned in part because Mulder and Terzakis rejected her "strong recommendation" to return any improperly transferred funds.  The asset transfer that ended the partnership was not complete until October 2002.

CHA investigators contacted UIT in February 2002, and Mori directed Howard to meet with them.  They questioned her about UIT's financial documents and about who could transfer money.  They evidently already had UIT's "financial packages."  Immediately after the interview, Mori allegedly asked Howard what was said; she responded that she would not lie for UIT.  Thereafter, she claims, the harassment worsened.  Though at what point and how often is unclear, Howard contends that Mori tried to convince her to "double-count" certain expenses to make it appear that less money was missing.  When that failed, she contends, some of her job responsibilities were taken away (in that Reyes required one Jamie Perez ("Perez") to supervise Howard's CHA journal entries, despite Perez's lack of familiarity with CHA accounting principles).

Howard contends that she was hospitalized during her employment for health problems related to the stress of her situation at UIT.

Howard quit on June 2, 2002 (because, she says, she was given a stack of CHA journal entries to enter, without time to verify their truth). Soon thereafter, she contacted the CHA investigators, and gave them some documents. The CHA OIG issued its report that month, finding that improper withdrawals had been made. Later, UIT and the CHA reached a settlement regarding the missing CHA funds (which Howard contends did not cover the amount owed). Late in 2002, Howard and Hart, with counsel, met with the U.S. Attorney's Office and CHA investigators to discuss this case.

## II. LEGAL STANDARD

The Court applies the ordinary summary judgment standard. *See, e.g.,* FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986).

## III. DISCUSSION

Defendant Gardner seeks judgment on Counts I-IV.

### A. Counts I & II

Gardner seeks judgment on Counts I and II on two grounds: first, that the Court lacks jurisdiction over the FCA claims because Howard is not "original source," and second, because the settlement with UIT bars these claims.

### 1. Whether Howard is an original source

To determine whether it has jurisdiction over FCA claims, the Court asks: (1) "whether the relator's allegations have been publicly disclosed[,]"; and, if so, (2) "whether the lawsuit is 'based upon' those publicly disclosed allegations[,]"; and, if so, (3) "whether the relator is an 'original source' of the information upon which his lawsuit is based." *Glaser v. Wound Care Consultants, Inc.,* 570 F.3d 907, 913 (7th Cir. 2009). The plaintiff bears the burden at each step. *Id.*

Gardner asks this Court to reconsider Judge Wayne Andersen's ruling that Howard is an original source. In that Motion to Dismiss, neither party disputed public disclosure. *U.S. ex rel. Howard v. Urban Investment Trust, Inc.,* 2009 WL 2252252, at *3 (N.D. Ill. Jul. 29, 2009). Judge Andersen applied *Glaser*, and found that the suit was based upon the publicly disclosed information, because the CHA's Final Report and Jay Johnson's affidavit were substantially similar to Howard's Third Amended Complaint; they "implicate[d] the same people, involve[d] the same period, and set forth the same type of activity, namely improper transfers of funds." *Id.* He did not distinguish between the CHA and non-CHA properties.

Finally, Judge Anderson concluded that Howard was an original source. The pertinent version of the statute defines an "original source" as a person who has "direct and independent knowledge of

the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action . . . based on the information." *See id.* at \*4 (citing 31 U.S.C. § 3730(e)(4)(B)). Judge Andersen noted that it was undisputed that Howard had independent knowledge. *Id.* Despite Defendants' arguments that Howard had only voluntarily disclosed her information *within UIT*, he found that she had adequately alleged voluntary provision by claiming that she: (1) voluntarily provided information to the CHA investigators when interviewed; and (2) initiated meetings with CHA investigators in June 2002. *Id.* All of that occurred, he noted, well before this case was filed in October 2003. Gardner now argues that the record now refutes any claim that Howard volunteered her information.

### a. *Voluntariness*

The Court assumes, as did the parties and Judge Anderson, that contact with the CHA may constitute provision to the "government." *See United States. v. Bank of Farmington*, 166 F.3d 853, 866 (7th Cir. 1999) (noting that a relator might satisfy the requirement by contacting the "agency or official responsible for the particular claim in question[.]") *overruled on other grounds by Glaser,* 570 F.3d at 920. Since that opinion, the Supreme Court has confirmed his implicit conclusion that a state or local investigation report constitutes a public disclosure under the FCA. *Graham Cty. Soil*

*and Water Conservation Dist. v. U.S. ex rel. Wilson*, 130 S.Ct. 1396, 1411 (2010).

Defendant argues that "voluntary" means unsolicited, not merely uncompelled, and cites cases finding that people under some compulsion to cooperate cannot be original sources. *See* Def.'s Mem. In Supp. of Summ. J. 5-6 (citing *U.S. ex rel. Barth v. Ridgedale Elec., Inc.,* 44 F.3d 699, 701 (8th Cir. 1995); *U.S. ex rel. Stone v. AmWest Sav. Ass'n,* 999 F.Supp. 852, 853 (N.D. Tex.1997)). Defendant stresses that Howard testified that she did not intend to approach the government before it contacted her in February 2002, despite long having known about the alleged fraud. Furthermore, Gardner argues, Howard testified that she returned to investigators in June 2002 just to clear her name. Thus, Gardner argues, her initial contact was involuntary, as in *Barth,* and her subsequent conduct was essentially an effort to seek immunity, as in *Stone.*

Defendant further emphasizes that the documents were returned to Howard with the (hearsay) comment that the CHA already knew what was going on, and the CHA issued its report shortly thereafter (and so, it surmises, found Howard's evidence unhelpful). Finally, Gardner argues, once she had been interviewed, Howard had an ongoing obligation to assist in the investigation (though she cites no authority to that effect). All of this, Gardner argues,

contradicts Howard's vague and self-serving affidavit on which Judge Anderson based his original ruling.

Howard stresses that she need not be the only original source, and that the statute requires neither that disclosure occur by any particular time pre-filing, nor that she be the source of the public disclosure. While true, none of this demonstrates that when giving information to the government, she did so "voluntarily."

Howard next emphasizes that she was not under subpoena or any other legal compulsion when she spoke to the investigators. Further, she argues, she called the CHA the day she quit, to have them deactivate her CHA access, "because" she would not participate in embezzlement. (Howard's testimony is ambiguous as to whether she gave the "because" explanation to the CHA, or only in deposition. 2008 Howard Dep. 242:12-43:3.) Thereafter, she argues, she contacted investigators again, giving them documentation of the embezzlement; she claims that they copied the documents before returning them. Finally, Howard notes the pre-filing meeting at the United States Attorney's Office. These various contacts, she argues, were indisputably voluntary.

Howard distinguishes *Stone* and *Barth* on the grounds that Howard did not wait to talk until she had received immunity (as in *Stone*), and no other source had conducted a separate investigation (as in *Barth*). She claims that because Hart and Johnson's disclosures to the CHA were based on her information, and she

willingly met with investigators after February, her case is unique. As to the first point, that Howard uncovered the information that Hart and Johnson turned over might make her "original," but not a "source." *See Bank of Farmington,* 166 F.3d at 865 (noting that "original" means having direct and independent knowledge, whereas a "source" is one who "voluntarily provided the information to the Government before filing an action[.]") Howard cites no case in which an uninvited disclosure by a third party was deemed "voluntary" under the FCA. Her second point, however, merits further inquiry.

Relatively few courts have closely analyzed what constitutes a "voluntary" disclosure under the pre-2010 FCA. A few cases, however, offer guidance. As noted above, Defendant cites *Price,* in which a relator's disclosure was deemed involuntary, as he did not come forward until after his time as CEO was over, and he had secured immunity.

In *U.S. ex rel. Barth v. Ridgedale Elec., Inc.*, the Eighth Circuit confronted a case of two sources, only one of whom had direct, independent knowledge. *Barth*, 44 F.3d 699, 701-04 (8th Cir. 1995). Nonetheless, the Court affirmed that he was not an original source, because he did not provide his information "voluntarily" – his only contact with the government was when a HUD investigator initiated an interview almost two years after the alleged fraud. *Id.* at 704. Finding that Barth "voluntarily" provided his

information, it noted, would ignore the FCA's "clear intent" "to encourage private individuals who are aware of fraud against the government to bring such information forward at the earliest possible time and to discourage persons with relevant information from remaining silent." *Id.* (citations omitted).

The Third Circuit faced a similar situation in *U.S. ex rel. Paranich v. Sorgnard*, 396 F.3d 326 (2005). There, the putative relator (a chiropractor) was reported to the FBI as overbilling for services. *Id.* at 330. Responding to a subpoena, he turned over his records along with his (and his counsel's) investigation into the company that provided the medical device at the center of the dispute. *Id.* Despite having turned over much more information than the subpoena demanded, the relator was not an original source; production, initiated by the government in the form of a subpoena relating to the relator's practices, could not be called "voluntary" consistent with the underlying policy of *qui tam* actions. *Id.* at 340-41. The court found "other forms of self-interest[,]" like trying to shift blame, sufficient incentive in such cases; therefore, "[i]nformation not specifically compelled but nonetheless brought forward as a result of the government's pointed contact should not be deemed 'voluntarily' provided." *Id.* Neither party cited a case in which the Seventh Circuit has squarely addressed the issue. Nonetheless, in *Glaser,* it approvingly quoted *Barth*'s discussion of the FCA's underlying

policy and cited *Sorgnard* for the proposition that the voluntary disclosure requirement is "designed to reward those who come forward with useful information and not those who provide information in response to a governmental inquiry." 570 F.3d at 915, 917. Although these discussions arose in determining when a complaint is "based upon" a public disclosure, they offer insight into how this Circuit views the voluntary production requirement. Of course, those cases do not precisely square with this one. Nonetheless, the Court finds that on the current record, Howard's 2002 meeting was directed by UIT and investigators, and involuntary under *Barth*. Regarding the June meetings, Howard's testimony shows that whatever she produced (and that is not clear) was in direct response to the ongoing investigation and based in part on the desire to clear her name – just the sort of self-interest *Sorgnard* found involuntary. She testified as follows regarding her June contact with investigators:

> Why did I contact them? No. 1, I wanted to clear my name. No. 1, I wanted them to know I didn't embezzle anything. No. 1, I wanted them – another thing I wanted them to know, Here's the proof; go after the people who took the money. . . . My reputation was on the line. And if I ever planned to get an accounting job, I wanted to make sure CHA knew I was clear. I was not the cause of the problem. I wanted to direct them to the problem.

2011 Howard Dep. 151:23-152:19. Howard, along with Hart and counsel, undisputedly met with U.S. Attorneys and CHA representatives in late 2002. *See id.* 153:21-154:17. There is no indication, however, of what was said. *Cf. U.S. ex rel. Hafter*

*D.O.v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1162-63 (10th Cir. 1999) (noting that even in pleading, relators must offer details to support original source allegations). Absent more information, Howard cannot convert an involuntary disclosure to a voluntary one just by (possibly) adding a new listener.

Ordinarily, courts need (and perhaps should) not analyze a relator's subjective motivations. Mixed motivations, or a fear that one may get swept up in an investigation, are likely common in FCA cases. Here, however, Howard candidly gave her reasons for working with the CHA, and that she had not intended to report before investigators contacted her. *Id.* at 154:18-156:1. Here, voluntariness must be interpreted with an eye to the FCA's underlying policy of motivating relators to come forward on their own. Therefore, the Court finds that Howard can no longer meet her burden of showing that she is an original source, and that it lacks jurisdiction over her FCA claims. *Cf. Rockwell Intern. Corp. v. United States*, 549 U.S. 457, 460, 473 (2007) (noting that in FCA cases, jurisdictional allegations later proved false will defeat jurisdiction).

### b. Direct and independent knowledge

Having concluded that Howard is not an original source, the Court need not consider Defendant's argument about her alleged lack of direct knowledge. However, one further point bears mentioning. Howard contends that Gardner has not identified any public

disclosure of the South Shore information.  Therefore, she claims,
the public disclosure bar does not apply, and she need not prove
that she falls under the original source exception to that bar.
There is an argument that Judge Andersen found otherwise, in
finding that all of Howard's claims were "based upon" public
disclosures (though the question of public disclosure was
undisputed at that stage).  Howard points to no new information
undermining that result.

Defendant, however, responds only that the South Shore
information was disclosed "as referenced at the end of the CHA's
Final Investigative Report."  Def.'s Reply 6.  The end of that
Report, however, states that the investigation had uncovered that
"the practice of transferring money from CHA accounts is not
limited to [URSC.]"  Gardner Dec. Ex. 1, at 3.  It refers to CHA
properties managed by non-URSC entities, not non-CHA properties
handled by URSC or UIT.  Accordingly, with no direct evidence of
public disclosure, Howard's South Shore claims may proceed,
regardless of her original source status.  The remaining FCA claims
are dismissed for lack of jurisdiction.

## B.  Count III

In Count III, Howard alleges retaliation in violation of the
FCA.  Gardner argues that she is entitled to summary judgment
because Howard is a "fraud-alert" employee who did not put Gardner
on notice of an impending *qui tam* action, and because Gardner never

took adverse employment action against her. Finally, she argues, UIT's corporate veil cannot be pierced to reach her. (Gardner concedes that Judge Anderson, ruling on Synergy's motion, denied summary judgment on the issue of whether Howard engaged in protected conduct.) The parties do not explicitly analyze whether Gardner or UIT must have had the requisite notice or taken adverse action. Because this distinction is critical and turns on the veil-piercing issue, the Court turns first to Gardner's third argument.

### 1. Veil Piercing

"To pierce a corporate veil under Illinois law, a plaintiff must demonstrate that there is 'such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.'" *Sea-Land Servs. Inc. v. Pepper Source*, 993 F.2d 1309, 1311 (7th Cir. 1993). (Other district courts in similar circumstances have applied federal law. *See, e.g., U.S. ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 191 F.Supp.2d 17, 20-21 (D.D.C. 2002). The parties have not asked to apply federal law, however, and the result is the same either way.) Veil piercing is an equitable remedy, but heavily fact-based. Therefore, a court may appropriately resolve the equitable question once the facts

have been established at trial. *Int'l Fin. Servs. Corp. v. Chromas Tech. Canada, Inc.*, 356 F.3d 731, 737-40 (7th Cir. 2004).

Gardner argues that veil-piercing is inappropriate because no evidence contradicts her denial of any wrongdoing, and because UIT was an adequately capitalized corporate entity whose corporate formalities were adequately respected. The Court agrees with Howard, however, that Gardner's reliance on Howard's deposition for these facts is misplaced. It further notes that Gardner's approach of attaching a mass of largely unanalyzed documents (without specific citations or supporting arguments) to show that UIT complied with corporate formalities, is unhelpful and fails. *See, e.g.,* Def.'s Resp. to Pl.'s Statement of Additional Facts, 15 ¶ 32. Though there may have been a Board of Directors, Gardner failed to deny properly Howard's claim that it never met. Therefore, the issue of what formalities were respected is ripe for development at trial.

Regarding Gardner's conduct, the Court likewise finds that Howard has brought forth enough evidence to defeat summary judgment that Gardner made or authorized improper transfers, without regard to corporate or legal formalities. With regard to additional considerations such as capitalization, neither party has conducted a precise discussion of the level of capitalization needed, particularly in terms of unencumbered assets, rather than initial investment or liquid capital. *See Laborers' Pension Fund v. Lay-*

*Com, Inc.*, 580 F.3d 602, 612-13 (7th Cir. 2009). Furthermore, whether the capitalization inquiry should be applied at the subsidiary or parent corporation-level will also depend on factual issues that require development. Therefore, Gardner's claim for summary judgment on the issue of veil piercing is denied.

The Court pauses to note that veil piercing remains an open question; it is not a given. Nor is it necessarily true that if the veil should be pierced as between the various business entities that it necessarily should be pierced as to Gardner's personal assets. After all, Courts should separately consider whether veil-piercing is appropriate as to any particular shareholder, and Howard primarily contends that Gardner improperly moved funds to "prop up" her other business investments and *Mulder's* personal account, not her own. *See Id.* at 611-14; Pl.'s Resp. to Summ. J. 15-16.

### 2. *Personal vs. Corporate Notice and Conduct*

The Court turns next to whether Howard must prove what Gardner personally, or UIT as a corporation, knew or did regarding her FCA claim. Proceeding on a veil-piercing theory means that Gardner may be liable for the corporate conduct. Thus, the Court need not focus on her personal knowledge or conduct. *Cf. Siewick,* 191 F.Supp.2d at 20-22 (noting that officers are not generally "employers" under § 3730(h), but might be liable under a veil

piercing theory). She will not, however, be liable for UIT's actions after she dissociated from the company – whenever that was. Howard contends that Gardner remained in charge of UIT until October 2002, despite her purported November 2001 resignation. For support, Howard points to several documents, including an excerpt from the 2002 asset transfer agreement between Mulder, Terzakis, and Gardner; a letter purportedly written by Gardner, and pages from Gardner's personnel file with Synergy, which Howard claims show that Gardner worked for UIT at least through March 2002, and did not join PSG until June. Gardner is correct, however, that most of these documents lack adequate foundation. *See Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 777-78 (7th Cir. 2006) (noting that at summary judgment, a party must generally support evidence offered under the business records exception by an affidavit from a qualified custodian). The Court disagrees with Defendant, however, that such a foundation is required for Howard's Exhibit BB, which appears to be a signed letter by Gardner, reassigning certain administrative duties within UIT on December 11, 2001.

Howard also cites Mori's statements that during the 2002 transition, Gardner at times directed each of the three UIT spinoffs in dividing up properties and databases, and that PSG was located in the same building as UIT. Howard is correct that Gardner testified that on paper, at least, she retained her

interest in all of the various properties until October 2002. (She also testified that after resigning, she continued to "wind up" and "transition" some unnamed projects and responsibilities.) Howard's citation to her own deposition, however, is unhelpful – she merely testified that she is unsure if Gardner ever gave up control of UIT in 2001, "because there's financial documents that say [U]rban wasn't — they didn't split until after I was gone[.]" 2011 Howard Dep. 148:16-19. Absent those documents, and an adequate foundation for them, Howard has not created a genuine issue of material fact with her testimony. Nonetheless, Howard's supported evidence is enough to create a question of material fact as to when Gardner relinquished what control over the company.

### 3. Adverse Employment Action

Having concluded that, at this stage, Gardner's personal knowledge and actions are not determinative, the Court finds that Howard has come forward with sufficient evidence to reach a jury regarding whether Howard was subjected to adverse employment actions during Gardner's tenure. She claims that she was constructively discharged, and her duties stripped, in the spring and summer of 2002.

However, the evidence could support an averse action finding even before that. The statute defines prohibited retaliatory conduct to include threats and harassment. 31 U.S.C. 3730(h) (West 2008). Therefore, the October 2001 letter from Mori, which Howard

claims threatened her job, could support a finding that Howard was harassed in retaliation for acts that Judge Andersen found may constitute protected conduct.

### 4. *Notice*

The closer question is whether Howard gave UIT sufficient notice that she might sue. The Court concludes that Howard likely was a "fraud-alert" employee even though she is not a CPA; her job involved, in part, detecting and reconciling account inconsistencies. Accordingly, Howard's reporting of discrepancies, would not necessarily put UIT on notice that she believed there was fraud, or might bring an FCA claim.

The Seventh Circuit has not been entirely clear as to what notice is required from "fraud-alert" employees. *See Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd*., 277 F.3d 936, 944-45 (7th Cir. 2002) (noting that where a relator's job involved ensuring that billing practices complied with Medicare rules, he had not given his employer sufficient notice of a possible FCA claim despite using terms like "illegal," "improper," and "fraudulent"; he never threatened to report the fraud or sue). *Cf. Fanslow v. Chicago Mfg. Ctr., Inc.,* 384 F.3d 469, 484 (7th Cir. 2004) (noting *Brandon,* but suggesting agreement with circuits that hold that "'fraud-alert' employee[s] may be expected to use words like 'illegal' or 'unlawful' when sharing" their concerns.); *U.S. ex rel. Stone v. OmniCare, Inc*., No. 09 C 4319, 2011 WL 2669659, at *7

(N.D. Ill. Jul. 7, 2011) (noting that tension, and following *Fanslow* to find that a fraud-alert employee's telling the board that his audit reports found "fraud" was sufficient).

Here, Howard testified that she repeatedly told various employees that she would not lie or go to jail to protect UIT, and that UIT knew that she cooperated with the CHA investigation. Even if she did not specifically state that she would bring an FCA claim, her comments sufficiently placed UIT on notice of the distinct possibility of such a claim. The Court therefore denies Defendant's Motion for Summary Judgment as to Count III.

### C.  Count IV

Finally, Defendant moves for summary judgment as to Howard's Count IV for intentional infliction of emotional distress ("IIED"). Gardner is entitled to summary judgment, she claims, because there is no admissible evidence that Gardner acted in an extreme or outrageous manner, or knew that her conduct would harm Howard. This is so, she claims, because Howard only alleges that Gardner "lied" to her by smiling and saying hello while continuing to embezzle, and there is no evidence that Gardner embezzled. Gardner likens her situation to that of Synergy, which was granted summary judgment because failing to investigate Howard's claims was not extreme or outrageous enough to warrant liability.

Howard argues that Gardner is liable for IIED both personally and under a veil-piercing theory. See Pl.'s Resp. to Mot. For

Summ. J. 18 n. 12. Personally, Howard argues that Gardner fired Johnson for complaining about the transfers, and then "stood by as Mori and Reyes tightened the screws on Howard, pressuring her to make fraudulent entries into the CHA's accounts. Gardner knew Howard was suffering physical stress from what was happening at urban, and Howard was hospitalized twice while working there." *Id.* at 18. (There seems to be no evidence that Gardner knew of the hospitalizations, as opposed to the stress.)

The Court finds that the allegations against Gardner personally are largely based on her actions toward other employees and a failure to protect Howard, rather than her actions toward Howard. They do not rise to the level of being actionable under the tort of IIED. However, Howard has presented sufficient evidence to defeat summary judgment with regard to the IIED claim against UIT, and thereby against Gardner under a veil-piercing theory. The Court concludes that Howard's evidence, when taken in the light most favorable to her, fits comfortably within the holdings of Illinois courts regarding employers who pressure employees to falsify records. *See, e.g., Milton v. Illinois Bell Tel. Co.,* 427 N.E.2d 829, 832-33 (Ill. App. Ct. 1981). Therefore, her claim survives, regardless of whether Howard has produced medical evidence of the emotional consequences; such medical proof is not a prerequisite to an IIED claim under Illinois law. *Honaker v. Smith*, 256 F.3d 477, 495-96 (7th Cir. 2001). Therefore, the

motion for judgment on Count IV is granted in part and denied in part.

## IV.  CONCLUSION

For the reasons stated herein, the Court rules as follows:

1.   Counts I and II of the Complaint are dismissed, except with regard to the South Shore claims; and

2.   Gardner's Motion for Summary Judgment is denied as to Count III, and granted in part and denied in part as to Count IV.


**IT IS SO ORDERED.**


_____
      Harry D. Leinenweber, Judge
      United States District Court

**DATE:** 9/5/2012